UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
CROWN CASTLE NG EAST LLC,

                Plaintiff,

**MEMORANDUM & ORDER**

         -against-                      CV 17-3148 (GRB)

THE TOWN OF HEMPSTEAD, THE TOWN OF
HEMPSTEAD TOWN BOARD, JOHN ROTTKAMP
AS THE TOWN OF HEMPSTEAD BUILDING
DEPARTMENT COMMISSIONER (in his official
capacity), AND THE TOWN OF HEMPSTEAD
BOARD OF ZONING APPEALS,

                Defendants.

----------------------------------------------------------X

**GARY R. BROWN, United States Magistrate Judge:**

       Plaintiff Crown Castle NG East LLC ("Crown Castle"), a provider of wireless electronic services, seeks various forms of relief arising from its attempts to construct and install 4G LTE towers in areas designated as rights of way owned by the Town of Hempstead based upon an alleged failure to timely resolve plaintiff's applications for permission to construct these facilities, purported administrative roadblocks in connection with these installations, and ostensibly discriminatory fees connected with such applications. Pending in this matter, which is before the undersigned for all purposes upon consent of the parties (*See* Docket Entry ("DE") 10), is a summary judgment motion filed by plaintiff, a cross-motion for summary judgment filed by defendants and several additional procedural motions aimed to further these applications.

       Defendants principally contend that the protections of 47 U.S.C. § 332(c)(7) are inapplicable here because the subject nodes—4G LTE facilities—handle voice communications as digital, rather than analog, signals. Because under the statutory framework, as interpreted by the

Second Circuit, the services proposed by Crown Castle constitute "personal wireless services" as defined in the Telecommunications Act of 1996 (TCA), defendants' motion for summary judgment fails. At the same time, because plaintiff has failed to establish, upon undisputed fact, that the proposed nodes are designed to remedy a gap in cellular telephone service—as opposed to a deficit in 4G LTE service—plaintiff is also not entitled to summary judgment on this record. Despite the weighty filings of the parties, questions remain as to the applicability of certain sections of the TCA, which are addressed herein.

## PROCEDURAL HISTORY

This action began with the filing of a complaint on May 24, 2017, which was amended on December 22, 2017, seeking "declaratory and injunctive relief and expedited treatment" regarding plaintiff's efforts to erect Distributed Antennas System ("DAS") facilities in the Town of Hempstead. DE 1, 14. The 56-page amended complaint contains the following summary of the allegations:

> Crown Castle is a provider of telecommunications services that deploys telecommunications facilities in municipal public rights-of-way in order to provide its services.
>
> Crown Castle's telecommunications facilities, also known as personal wireless services facilities, consist of non-obtrusive antennas and equipment mounted on utility poles and other pole infrastructure in the right-of-way along the roadside.
>
> Crown Castle in an attempt to gain access to the Town's public rights-of-way for the provision of its services filed forty-eight ( 48) applications (the "Applications") for authorization to install, operate, and maintain its facilities in the Town's public rights-of-way. Crown Castle filed fourteen (14) initial applications on January 18, 2017 ("Phase 1 Applications"), sixteen (16) applications on February 1, 2017 ("Phase 2 Applications"), and eighteen (18) applications on March 17, 2017 ("Phase 3 Applications"). Since the Applications were filed, the Town has unlawfully delegated its review authority to a third-party consultant. The consultant has frustrated the Town's process and review authority by imposing on Crown Castle unreasonable and vague demands for information and facility design

> changes based upon arbitrary and unsupported findings of visual impact. The Town has also demanded unreasonable, excessive and discriminatory fees.

DE 14 at 1–2. Based on the allegations contained therein, the amended complaint purports to set forth twelve causes of action for various forms of relief, including the declaratory, injunctive and expedited relief mentioned earlier, as well as money damages.

Ruling in connection with various applications concerning the scheduling of a Rule 12(b)(6) motion, the undersigned noted:

> the Court will extend the time to respond to the Amended Complaint to February 7, 2018 which seems a short time to file a motion to dismiss, but plenty of time in which to file an answer, though defendants remain free to respond in any way they see fit. However, it is worth noting that this matter would involve, at most, a limited period of discovery (if any), and it would seem that any argument raised on a Fed. R. Civ. P. 12(b)(6) motion could equally well be raised in the context of a Fed. R. Civ. P. 12(c) motion or on summary judgment pursuant to Fed. R. Civ. P. 56, which will follow shortly. Assuming defendants opt to file an answer, the parties should file a joint schedule for summary judgment by February 21, 2018.

Electronic Order dated 1/26/18. On June 13, 2018, the parties filed the fully-briefed instant motions, which filings include more than 100 separate documents, as well as a hard copy of the four-binder administrative record. DE 22–26. Most recently, plaintiff filed a notice of supplemental authority, to which defendants responded, and has been considered by the Court as part of this decision. DE 27–28.

One aspect of the procedural history here bears explication. Much of the briefing focused on a motion to strike the expert declaration of Roger Mascetti offered by defendants because, in sum and substance, plaintiff claims that Mascetti was not *identified* as an expert witness during discovery. *See, e.g.,* DE 24 at 3. In urging the Court to strike Mascetti's declaration, plaintiff relies upon, among other things, an unpublished opinion from the Second Circuit which recognized

that it was within the trial court's discretion to grant such an application based upon a prejudicial failure to provide expert discovery. *DVL, Inc. v. Niagara Mohawk Power Corp.,* 490 F. App'x 378 (2d Cir. 2012). However, review of the underlying district court opinion reveals that *DVL* involved full bore discovery including the exchange of expert reports. *DVL, Inc. v. Gen. Elec. Co.*, 811 F. Supp. 2d 579, 587 (N.D.N.Y. 2010). Here, by contrast, the parties had an extremely abbreviated, limited discovery period as a result of plaintiff's insistence, *ab initio*, of its entitlement to expedited adjudication. *See, e.g.,* DE 16 at 3. Moreover, plaintiff has been afforded ample opportunity to provide responsive evidence, has fully taken advantage of such opportunity, *(see, e.g.,* DE 24-10) and therefore has not suffered any prejudice. Upon review, it appears that the Mascetti Declaration is helpful—though far from conclusive—to the Court in this matter.[1] As such, while recognizing that the Court has the discretion to disregard the subject declaration, it declines to do so, and the motion to strike is denied.

**UNDISPUTED FACTS**

A summary of the material undisputed facts, as relevant herein, follows:

The subject facilities for which Crown Castle seeks approval consist of 48 distributed antenna system (DAS) nodes designed to facilitate access to the 4G LTE (an abbreviation for Fourth Generation Long-Term Evolution) data network operated by Verizon. DE 24-10, ¶ 8. The 4G LTE system is a "broadband service" that provides wireless service including voice and data transmission. DE 24-1, ¶ 160. It is undisputed that the DAS nodes would carry voice communications using Voice over LTE ("VoLTE"), which is one part of the 4G LTE wireless service and is embedded into the architecture of the 4G LTE system. *Id.* ¶ 164.

One purportedly disputed fact concerns the way in which the 4G LTE system handles voice

---

[1] Indeed, the Mascetti Declaration contains some information with which the undersigned has significant familiarity. *See generally Cablevision Sys. Corp. v. Verizon N.Y. Inc.*, 119 F. Supp. 3d 39 (E.D.N.Y. 2015).

4

communications. Defendants proffer that "[a] wireless broadband system treats all information as data, whether voice, text, internet or video." *Id.* ¶ 163. In attempting to "partly dispute" this assertion, plaintiff responds that "[t]he process of delivering voice versus the process of delivering actual data, (such as a picture, video clip, file or e-mail) is treated completely different [sic] in an LTE network." *Id.* Examination of the evidence submitted, however, reveals that this partial disputation is not supported. As explained by defendants' expert:

> A broadband system treats all information as data, whether voice, text, internet or video. This data is organized as data packets, regardless of the type of data. Thus, the 4G LTE system treats all information in an identical fashion -- zeroes and ones transferred over the wireless broadband network. In 2016, the International Telecommunications Union -- a United Nations organization tasked with setting wireless standards -- defined LTE (the newest generation of 4G service) as a wireless broadband technology, whether the system provided voice service or not.
>
> Although Verizon's voice service is identified as Voice over LTE (VoLTE), it is no different than any other data sent over the wireless broadband 4G LTE network. In fact, the very name, Voice over LTE, demonstrates that is part of -- not separate from -- the 4G LTE broadband technology.
>
> Prior to the introduction of VoLTE, wireless providers such as Verizon transmitted calls over traditional circuit-switched networks, such as CDMA, and accessed the internet over the newer IP-based (internet protocol) 4G network. VoLTE service enables wireless operators to use the data network to transmit voice services in the same way they transmit data – over the internet.
>
> Unlike earlier internet telephony, known as VoIP (voice over internet protocol), which used an application that needed to be launched from the platform (such as Whats App for a cell phone or Vonage for a home computer), VoLTE is imbedded into the architecture of the 4G LTE system, making streaming calls to the internet seamless.
>
> On a technical level, VoLTE is provided by the IMS (IP Multimedia Subsystem), which is the standardized framework for providing voice and other multimedia services, specifically over an IP based network. As such, VoLTE is a voice service over a broadband data connection that has no dependency on legacy switched networks (such as CDMA) used by cell carriers prior to the introduction of VoLTE.

> Thus, it is clear that 4G LTE is a broadband internet technology and VoLTE is simply one part of that technology.

DE 23-5, ¶¶ 12-17. In a responsive declaration, plaintiff's expert, by and large, does not disagree, observing that:

> The Town notes in the Mascetti Declaration that the "4G LTE system treats all information in an identical fashion - zeroes and ones transferred over the wireless broadband network." That is how all of the latest digital wireless technologies have been handling phone calls for the last two decades, including 3G service; *i.e.* the call is converted from analog to digital. 3G technologies such as CDMA, UMTS, GSM and TOMA all convert the call from analog to digital and all of those technologies are being phased out and are obsolete.

DE 24-10, ¶ 29. Plaintiff's expert response also includes the following discussion:

> The Mascetti Declaration also erroneously claims that LTE enables wireless operators to use the data network to transmit voice services in the same way they transmit data. While **LTE converts voice to digital data**, the process of delivering voice versus the process of delivering actual data, (such as a picture, video clip, file or e-mail) is treated completely different in an LTE network. For example, when a user takes a picture and sends the picture by text or e-mail from a mobile phone, if packets of data are lost during the transmission, the data packet is re-sent until the entire file is received and the picture can be viewed. This does not and cannot apply to a voice phone call. Because the conversation is happening in real-time, the conversation (analog voice converted to digital data) cannot be re-sent multiple times if the other person does not receive the transmission the first time. In addition, live voice calls from or to a mobile phone on LTE are not streamed to the internet, as the person on the other end of the call is not downloading or watching a stream, but rather is having a conversation in real-time.

*Id.* ¶ 30 (emphasis added). While an interesting nuance, these facts do not alter the basic assertion that "LTE converts voice to data"—to wit: sounds are converted to the ubiquitous zeros and ones of the computer world. *Id.* The conclusory statement by plaintiff's expert that "voice calls are not information services and are personal wireless services" is just that: a conclusion, not factual evidence. *See id.* at ¶ 31.

The parties have submitted evidence concerning whether there is a "gap" in coverage in the geographic areas that would be affected by the proposed 4G nodes. Plaintiff has submitted significant evidence in an effort to demonstrate an existing "gap" in 4G coverage that the subject nodes are intended to remedy. As plaintiff's expert describes:

> Crown Castle collected actual real world signal data for both the existing service levels and the service from each proposed node location by using specially equipped vehicles and presented that data to the Town in support of the Applications and did not simply rely on computer generated maps. Crown Castle actually placed a temporary antenna at each node location and collected the actual signal data to confirm the service that would be obtained by each proposed node once constructed as well as collected the ambient existing signal data to establish the significant gap in existing service.

DE 24-10 at ¶ 11. Though the experts quibble over some of the technical details, defendants' expert concedes, in large measure, that the plaintiffs have established a gap in 4G LTE service, which supplies, among other things, the capacity for consumers to make voice calls. *See generally*, DE 23-5.

Defendants' cite the absence of data concerning the availability of coverage through Verizon's existing 3G network to make telephone calls in the proposed locations of the 4G nodes. *See* DE 25-5. "As shown on the prediction [sic] maps, Crown Castle is using RSRP to demonstrate the signal strength for its 4G LTE broadband coverage. However, it would be expected that if Crown Castle's prediction [sic] maps were demonstrating Verizon's 3G coverage necessary to make a telephone call, the coverage area would be much greater." *Id.* at ¶ 11 ("the prediction maps demonstrate is 4G LTE broadband coverage, rather than the 3G coverage necessary to make a call"). Given the opportunity to contest this assertion, plaintiff has essentially demurred, but failed to controvert the claim. DE 24-10 at 17 ("The purpose of the Facilities is to address a significant gap in the Carrier Customer's wireless service by providing adequate and reliable advanced 4G LTE throughout the specified part of Town").

## LEGAL STANDARD

This motion for summary judgment is decided under the oft-repeated and well understood standard for review of such matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor,* 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 Fed.Appx. 54 (2d Cir. 2016), which discussion is incorporated by reference herein.

## DISCUSSION

### *Applicability of the TCA to 4G LTE Nodes*

On these motions, the parties contest whether and how the limitations and proscriptions of the TCA, in particular, 74 U.S.C. § 332 (c)(7) apply to the defendants on these facts. Plaintiff claims entitlement under § 332 to a panoply of protections, including expedited review. Defendants, in contrast, assert that § 332(c)(7) excludes coverage of the subject applications from the statute. The question is not a simple one, but there are answers. *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397 (1999) ("It would be [a] gross understatement to say that the Telecommunications Act of 1996 is not a model of clarity"); *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 641 (2d Cir. 1999) ("Our task, regrettably, requires a detailed parsing of the statutory language, including layers of highly technical definitions").

The analysis begins, as it must, with the statutory language, which provides, in relevant part, as follows:

> (7) Preservation of local zoning authority
>
> (A) General authority
> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
>
> (B) Limitations
> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government

> or instrumentality thereof--
> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C.A. § 332 (c)(7)(A) & (B)(i)(I) &(II). The statute defines "personal wireless service" to include "commercial mobile services . . . and common carrier wireless exchange access services."[2] 47 U.S.C.A. § 332(c)(7)(C)(i). "Commercial mobile service" is further defined as "any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public." 47 U.S.C.A. § 332 (d)(1). In turn, the United States Code defines "mobile service" to include "a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves." 47 U.S.C.A. § 153(33).

While navigating this complex statutory framework may prove daunting, the Second Circuit has provided a careful analysis and application of these provisions. In *Willoth*, the Court of Appeals considered a challenge by a telecommunications provider to a grant of summary judgment upholding a planning board's denial of an application to build cellular towers. In reversing the district court's decision, the Court of Appeals held that the planning board failed to comply with the strictures of the TCA in several respects. *Willoth*, 176 F.3d at 636. Importantly, the Second Circuit did a close review of the relevant portions of the TCA, finding that the statutory language, though difficult, was clear. That analysis of the statute proves critical in resolving the instant dispute.

---

[2] The definition of this phrase is somewhat more elusive. Fortunately, in its exacting review of this statute, the Second Circuit concluded that "common carrier wireless exchange access services . . . deals with the ability to make and receive telephone calls using wireless equipment." *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 642 (2d Cir. 1999).

The parties' positions in *Willoth* were quite telling and, in certain ways, not that different from those of the parties to the instant dispute. Sprint argued that it had "the right under this provision of the TCA to construct any and all towers that, in its business judgment, it deems necessary to compete effectively with other telecommunications providers, wireless or not." *Id*. at 639. The defendants, by contrast, claimed that the TCA "must be read as prohibiting only general bans" of cellular tower construction. *Id.* at 640. The Second Circuit rejected both positions. *Id.* at 639–40.

The Court of Appeals began by noting that the TCA was "'designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services.'" *Id*. at 637 (*quoting* H.R. Conf. Rep. No. 104–458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124.) At the same time, it recognized that this goal did not "trump all other important considerations, including the preservation of the autonomy of states and municipalities." *Id.* at 639 (noting that §332(c)(7) "is a deliberate compromise"). The nature of the legislative compromise reached, the Second Circuit held, is as follows:

> In the context of constructing a national wireless telecommunications infrastructure, Congress chose to preserve all local zoning authority "over decisions regarding the placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A), subject only to the limitations set forth in section 332(c)(7)(B).

*Id.* at 639–40. Having determined that "the Act's proscription that local government regulation of wireless service facilities 'shall not prohibit or have the effect of prohibiting the provision of personal wireless services,'" *Willoth* recognized that "[t]he question . . . is what Congress meant by 'personal wireless services,'" and concluded that "[t]he *plain statutory language* of subsection B(i)(II) read in conjunction with the appropriate definitions set forth in the TCA provides the answer." *Id.* at 641 (emphasis added).

In examining the statutory definition of "personal wireless services," *Willoth* combined the first and third components of that definition—to wit: "commercial mobile services" and "common carrier wireless exchange access services"—which are the components relevant both to *Willoth* and the instant case. The Court of Appeals held:

> Putting together the first and third components of the definition of "personal wireless services," those relevant to this case, we can conclude that the local government is proscribed from prohibiting for-profit radio communication services carried on between mobile stations or receivers and land stations that (1) are connected to the national telephone network and that (2) provide wireless phones with access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services.

*Id.* at 642. In other words:

> the parameters of the statutory proscription of local government's prohibition of "personal wireless services" in the context of this case depends upon a conception of "personal wireless services" that is the equivalent of the ability of mobile, handheld telephones to reach a cell site that provides access to a land-line exchange and allows phone calls to be made to and from the national telephone network.

*Id.* at 641. It is beyond question and dispute that the facilities at issue—4G nodes designed to connect with cellular phones, provide precisely this facility: they allow mobile, handheld telephones to utilize the national telephone network to place and receive calls to other mobile and landline telephones. Thus, the services provided in connection with these nodes constitute "personal wireless services" as defined by the plain terms of the statute and its construction by the Second Circuit in *Willoth*.

Defendants' contentions that § 332 is entirely inapplicable to the installation of 4G nodes because the 4G system processes voice communications as data fails for several reasons. First, the statute, as construed by *Willoth*, does not distinguish between voice calls made using analog technology from those made using digital technology. Answering the question "whether it is possible for a user in a given remote location to reach a facility that can establish connections to

11

the national telephone network," does not involve an inquiry as to the format of the signal involved. *Willoth,* 176 F.3d at 643. The statute, the binding caselaw construing that statute and, for that matter, consumers placing or receiving telephone calls, are unconcerned as to whether the communication system employs analog transmissions, digital signals or frequency hopping,[3] but care only that the call is successful.

And defendants' argument fails for a second reason. In *Willoth*, the Second Circuit focused on the effect of a demonstrated "gap" in coverage on the applicability of the statute, holding:

> the plain focus of the statute is on whether it is possible for a user in a given remote location to reach a facility that can establish connections to the national telephone network. In our view, therefore, the most compelling reading of subsection B(i)(II) is that local governments may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities. In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines.
>
> A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means. *See Town of Amherst,* 173 F.3d at 14 ("[I]ndividual denial is not automatically a forbidden prohibition," but disallowing "the only feasible plan ... might amount to prohibiting personal wireless service."). There are numerous ways to limit the aesthetic impact of a cell site. It may be possible to select a less sensitive site, *see Gearon & Co. v. Fulton County*, 5 F.Supp.2d 1351, 1355 (N.D.Ga.1998), to reduce the tower height, *see* Town of Amherst, 173 F.3d at 14–15, to use a preexisting structure or to camouflage the tower and/or antennae, *see, e.g., Cellco Partnership v. Town Plan & Zoning Comm'n of Farmington*, 3 F.Supp.2d 178, 185, 186 (D.Conn.1998) (describing antennae placed on water tower, and permitting applicant to reconstruct church steeple with six antennae placed inside); *Smart SMR of New York, Inc. v. Zoning Comm'n of Stratford*, 995 F.Supp. 52, 59 (D.Conn.1998) (describing an antenna placed on a billboard and current applicant seeking to conceal tower with seven evergreen trees). *See also Nancy D. Holt, Developments:*

---

[3] First deployed during World War II, "frequency hopping" refers to a technology used to avoid jamming of signals between warships and torpedos. Interestingly, the technique was pioneered by famed movie actress Hedy Lamarr. *See* Wenner, M. "Hedy Lararr: Not Just a Pretty Face," *Scientific American*, June 2008.

> *It May Be Art, But Can You Hear Me?,* Wall St. J., Dec. 10, 1997, at
> B14 (describing a multitude of camouflaged towers ranging from
> artful designs to silos, windmills, cactuses and pine trees). A local
> government may also reject an application that seeks permission to
> construct more towers than the minimum required to provide wireless
> telephone services in a given area. A denial of such a request is not a
> prohibition of personal wireless services as long as fewer towers
> would provide users in the given area with some ability to reach a cell
> site.

*Willoth,* 176 F.3d at 641–43. These limitations, though, change where the areas in question are not "underserved" by wireless services:

> [O]nce an area is sufficiently serviced by a wireless service provider,
> the right to deny applications becomes broader: State and local
> governments may deny subsequent applications without thereby
> violating subsection B(i)(II). The right to deny applications will still
> be tempered by subsection B(i)(I), which prohibits unreasonable
> discrimination. However, it is not unreasonably discriminatory to deny
> a subsequent application for a cell site that is substantially more
> intrusive than existing cell sites by virtue of its structure, placement or
> cumulative impact. We hold only that the Act's ban on prohibiting
> personal wireless services precludes denying an application for a
> facility that is the least intrusive means for closing a significant gap in
> a remote user's ability to reach a cell site that provides access to land-
> lines.

*Id.* Thus, even in absence of a demonstrated "gap" in coverage, the statute still applies to the review of applications by a municipal authority. The "gap" only determines the applicability of § 332(c)(7)(B)(i)(II)—which prevents a local authority from prohibiting the development of cellular service in underserved areas; the non-discrimination provisions of § 332(c)(7)(B)(i)(I)—prohibiting discrimination among and between providers continues to govern the actions of local authorities. Thus, defendants' contention that § 332 is entirely inapplicable fails.

Here, plaintiff contends both that defendants have acted to effectively "prohibit[] service" and that defendants have acted in a discriminatory manner *vis-a-vis* other service providers. *Compare* DE 22-1 at 13-15 (arguing denial of service), *with* DE 15-20 (contending fees imposed in discriminatory manner). Thus, defendants' cross-motion for summary judgment, predicated on the

notion that § 332 is completely inapplicable, is denied. However, to determine whether subsection (B)(i)(I) need be considered, the Court turns to the question of a demonstrated gap in coverage.

*Evidence Concerning the Gap in Coverage*

To properly apply § 332 to the instant case, the Court must first determine whether, based on the undisputed facts, defendants "must allow [Crown Castle] to fill gaps in the ability of wireless telephones to have access to land-lines." *Willoth* at 643. Plaintiff has made a largely undisputed showing that the nodes would remedy a gap (or at least a projected gap) in 4G LTE service in the affected areas, a demonstration that distinguishes this case from Judge Spatt's well-reasoned determination in *Clear Wireless LLC v. Bldg. Dep't of Vill. of Lynbrook*, No. 10-CV-5055 (ADS) (ETB), 2012 WL 826749, at *1 (E.D.N.Y. Mar. 8, 2012) and several other cases relied upon by defendants. In *Clear Wireless*, Judge Spatt determined that "Clearwire implied that a failure to upgrade to 4G could negatively impact Sprint's personal wireless services, leading to a deficiency in voice services, [but] offered no evidence to support this contention." *Clear Wireless*, 2012 WL 826749, at *7; *see also Cellco P'ship v. Bd. of Sup'rs of Fairfax Cty., Va.*, 140 F. Supp. 3d 548, 581–82 (E.D. Va. 2015) ("Verizon still cannot make out a prohibition of service claim because it has not proven that there is an effective absence of coverage").

Because plaintiff's evidence relates solely to the availability of 4G service, its demonstration does not end the inquiry. A gap in 4G coverage does not establish that the target area is underserved by voice cellular telephone service. The mandate of the Second Circuit on this question is clear: under § 332, Crown Castle is entitled to heightened protections for applications relating to a deficit in "the ability of wireless telephones to have access to land-lines." *Willoth,* 176 F.3d at 643. Again, the Second Circuit has held that "[a] denial of such a request is not a prohibition of personal wireless services as long as . . . users in the given area [have] some ability to reach a cell site." *Id.* Other courts considering the question presented here have similarly

14

concluded that the desire of a carrier to upgrade its existing service does not fall within the ambit of the statute governing the provision of access to the national telephone network. *Cellco P'ship*, 140 F. Supp. 3d at 582 ("plaintiffs' evidence demonstrates that there are existing Verizon sites in the area providing coverage, that there is at most a one-mile gap in 4G LTE coverage but not in 3G or traditional voice coverage, and that Verizon wishes to improve 4G LTE coverage rather than resolve an absence of coverage. Such improvements may be desirable, but they are not protected from local decisionmaking under 47 U.S.C. § 332(c)(7)(B)(i)(II)"). This requisite of law squares with the needs of mobile telephone users, who, provided they can place calls successfully, have little concern for the nature of the technology responsible.

The parties have raised several FCC orders and determinations which, they seemingly argue, change how this Court should apply the statute. Remarkably, in these pronouncements, the FCC changed its position repeatedly—sometimes in the space of as little as two years—as to whether broadband services should fall under the auspices of the TCA. *See Restoring Internet Freedom Order* ("2017 FCC Order") FCC-17-166; *In the Matter of Protecting and Promoting the Open Internet*, 30 F.C.C. Rcd. 5601 (2015); *Matter of Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies* ("2014 FCC Order"), 29 F.C.C. Rcd. 12865 (rel. Oct. 21, 2014); *In re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review ("Shot Clock Order")*, 24 F.C.C. Rcd. 13994 (2009); *In the Matter of Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 F.C.C. Rcd. 5901 (2007). Yet another such order appeared during the pendency of these motions, leading to additional filings by the parties. *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment, Declaratory Ruling and Third Report and Order,* Dkt. Nos. 17-79 and 17-84 (adopted Sept. 26, 2018; released Sept. 27, 2018); DE 27-28. Of course, the "Commission's use of its expert policy judgment to resolve these . . .

technical, complex, and dynamic" questions, including decisions which "appear[] to be a first step in an effort to reshape the way the Commission regulates information-service providers," have no effect on the deference to be accorded such determinations. *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1002–03 (2005).

The parties have argued about the nature of these authorities, whether they constitute procedural or substantive regulation, and whether their effect is retrospective or prospective. Clearly, the parties would have the Court rely upon the FCC's varying interpretations of the statute, and, at least at times, seem to suggest that such interpretations are controlling. *See, e.g.,* DE 24 at 11 (citing the FCC's "position" regarding the meaning of terms under the TCA); DE 27 at 2 ("Importantly, the FCC explains that courts have misinterpreted 47 U.S.C. § 332 if they have held that a wireless services provider must demonstrate a significant gap in coverage") and 3 ("the FCC confirms that § 253 and § 332 apply not only to wireless telecommunications services but also to commingled services and facilities"). However, where, as here, "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984); *Brand X Internet Servs.,* 545 U.S. at 986 (2005) ("Chevron established a familiar two-step procedure for evaluating whether an agency's interpretation of a statute is lawful. At the first step, we ask whether the statute's plain terms directly addres[s] the precise question at issue.").

Because the statute's plain terms, as analyzed in *Willoth*, resolve the questions before the Court, the additional authorities cited by the parties are "interpretive regulations, and thus entitled to deference only where persuasive." *See Scarpinato v. E. Hampton Point Mgmt. Corp.,* No. 12-CV-3681, 2013 WL 5202656, at *11 (E.D.N.Y. Sept. 13, 2013) (citing *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 106 (2d Cir. 2010)); *cf. United States v. Mead Corp.,* 533

U.S. 218, 226 (2001). Judge Spatt, confronted with a plaintiff who similarly "cite[d] extensively to statements, legislation, and rules by Congress, and the FCC lauding the importance of wireless broadband Internet access and the need to facilitate the proliferation of this service," held that:

> these statements do not guide the Court's analysis. Section 332(c)(7) is a compromise, and as the Second Circuit noted in *Sprint Spectrum v. Willoth*, 176 F.3d 630 (2d Cir.1999), they "do not read the TCA to allow the goals of increased competition and rapid deployment of technology to trump all other important considerations, including the preservation of the autonomy of states and municipalities." *Id.* at 603. Rather, consistent with the statutory analysis of "personal wireless services" set forth by the Second Circuit in *Willoth*, the Court must determine whether Section 332(c)(7) includes wireless broadband service as part of its definition of "personal wireless services" by looking to "[t]he plain statutory language of [section 332(c)(7) ] ... in conjunction with the appropriate definitions set forth in the TCA." *Id.* at 641.

*Clear Wireless,* 2012 WL 826749, at *6.

The undersigned agrees with concerns raised by several other courts about the difficulty in applying statutory and caselaw that preceded many of the innovations and evolving technology at issue in these cases. *See, e.g.*, *Clear Wireless,* 2012 WL 826749, at *9 ("the law has not kept up with the changes in technology") (*quoting Arcadia Towers LLC v. Colerain Twp. Bd. of Zoning Appeals*, 2011 WL 2490047, at *2 (S.D. Ohio June 21, 2011) ("It certainly makes sense as a policy objective for broadband services to have protections under the law equivalent to that provided by the TCA.")). At times, the statutory framework, shifting regulatory pronouncements and rapidly-advancing technologies can seem like a trackless forest of cellphone towers. Yet, as Judge Spatt observed, "[u]nder such a circumstance it is not up to the FCC to construe the TCA to say something it does not say, nor up to the Court to find broadband communication encompassed by the law." *Clear Wireless* 2012 WL 826749 at *9.

Thus, the remaining question for the Court is whether the "gap" in service has been demonstrated. Plaintiff largely misstates the nature of the problem, contending that "[i]t simply

17

does not make technological sense to fill an identified gap in wireless coverage with an old technology, such as 3G wireless service." DE 24-10 at ¶ 24. But the issue is not whether to fill a gap with 3G technology, but rather, factoring in existing 3G and 4G availability, does a deficit exist? The record here, replete with data about 4G service, is all but silent on the question of the availability of service generally. Based on this absence of evidence, plaintiff's motion for summary judgment is denied as to plaintiff's denial of service claims under § 332.

The Court is prepared to schedule a hearing on the issue of whether, in considering the availability of 3G and 4G LTE service in the target geography (as well as any other available mechanisms that provide connections between mobile telephones and the national telephone network), there exists a deficit in voice communications service in that area. However, it is unclear from the filings whether the parties have the requisite data to conduct such a hearing. As such, the parties are directed to file a status report within ten days of the date of this memorandum and order. That report, which preferably should be filed as a joint report, should address whether and when such a hearing should be held, what discovery might be required before such a hearing and/or whether the findings herein mandate a remand for further administrative action by defendants.

*Discriminatory Fees*

While the parties have submitted significant evidence concerning whether the fees charged by the defendants violate the anti-discrimination provisions of § 332, the findings contained herein may well affect the viability or scope of plaintiff's motion. As such, plaintiff's motion for summary judgment regarding fees is deemed withdrawn without prejudice to refiling upon notice to the parties and the Court.

## CONCLUSION

For the reasons set forth herein, it is hereby ORDERED that:

- defendants' cross-motion for summary judgment is denied;

- plaintiff's motions for summary judgment as to alleged prohibition of service, to strike the expert declaration and for sanctions, costs and fees are denied;

- plaintiff's motion for summary judgment as to discriminatory fees is deemed withdrawn without prejudice to refiling; and

- Counsel should meet and confer to determine if discovery, hearing and/or remand is required on the remaining claims, and if so, the scope and timing of said discovery as well as the remaining matters to be litigated.

Within 21 days of this decision, counsel shall submit a status report consistent with this decision.

SO ORDERED.

Dated: Central Islip, New York
   December 17, 2018

                /s/ Gary R. Brown
                GARY R. BROWN
                United States Magistrate Judge